| | |
|---|---|
| BARBARA JEANE GAINES o/b/o T.D.G. | CIVIL ACTION NO. 1:16-CV-00825 |
| VERSUS | JUDGE DRELL |
| ACADIA HEALTHCARE CO., INC. *et al.* | MAGISTRATE JUDGE PEREZ-MONTES |

## REPORT AND RECOMMENDATION

Defendants filed a Motion to Dismiss for lack of subject matter jurisdiction (Doc. 25). Because Plaintiffs have not shown their claim meets the jurisdictional amount for diversity jurisdiction, Defendants' motion should be granted.

## I. Background

Before the Court is a Complaint filed in this Court by Plaintiff Barbara Jeane Gaines ("Gaines") on behalf of T.D.G. ("TDG") (Docs. 1, 15). The remaining Defendants are Crossroads Regional Hospital, L.L.C. of Louisiana d/b/a Longleaf Hospital ("Longleaf") and Keith Newman ("Newman") (a Mental Health Technician employed at Longleaf Hospital). Plaintiffs premise federal jurisdiction on diversity of citizenship. See 28 U.S.C. § 1332.[1]

Plaintiffs contend TDG was undergoing in-patient treatment at Longleaf on August 23, 2015, for the third time, for intermittent explosive disorder, defiant

---

[1] The diversity statute – 28 U.S.C. § 1332 – is satisfied upon a showing of: (1) diversity of citizenship between the parties; and (2) an amount in controversy in excess of $75,000, exclusive of interest and costs. "Complete diversity requires that all persons on one side of the controversy be citizens of different states than all persons on the other side." Harvey v. Grey Wolf Drilling Co., 542 F.3d 1077, 1079 (5th Cir. 2008).

disorder, and ADHD.  TDG was considered to be at risk for hurting himself and others (Doc. 15).  When TDG became involved in a verbal argument with another patient, Newman and two other Mental Health Technicians removed TDG from the common area and took him to his room, where Newman struck TDG, lacerating his nose and giving him two black eyes (Doc. 15).  TDG then had to be injected with a sedative to calm him down (Doc. 15).  Plaintiffs allege federal and state law claims of assault and battery against Newman and Longleaf Hospital, and medical malpractice and negligence (in hiring, training, and supervising) against Newman and Longleaf Hospital.

The parties are diverse.  But, Plaintiffs have never asked for a specific amount of damages, asking instead for damages "in an amount to be determined at trial, plus costs, and for any further relief" due to the assault and battery, and for a "judgment" plus costs and any additional relief due to negligence and medical malpractice (Doc. 15).  Defendants filed a motion to dismiss for lack of subject matter jurisdiction, arguing the case does not meet the $75,000 jurisdictional threshold (Doc. 25).  Plaintiffs oppose that motion (Doc. 31).

## II.  Law and Analysis

### A.  Standards governing the Motion to Dismiss pursuant to 12(b)(1).

Lack of subject matter jurisdiction may be found on any one of the following bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the Court's resolution of disputed facts.  See Robinson v. TCI/US West

Communications, Inc., 117 F.3d 900 (5th Cir. 1997). Where subject matter jurisdiction is being challenged, the trial court is free to weigh the evidence and resolve factual disputes in order to satisfy itself that it has the power to hear the case. No presumptive truthfulness attaches to the plaintiff's allegations. Montez v. Dep't of Navy, 392 F.3d 147, 149 (5th Cir. 2004).

**B.** **Plaintiffs' allegations.**

Plaintiffs allege that, while TDG was receiving treatment in the Longleaf Hospital on August 23, 2015, he became involved in a verbal argument with another juvenile patient (Doc. 15). TDG was removed from the common area to his room by mental health technicians Keith Newman and "Josh." In his room, Keith and Josh struck TDG about his head and torso with their fists while a third Technician stood at the doorway. TDG sustained a laceration to his nose, two black eyes, pain, and emotional distress (Doc. 15). TDG had to be injected with a sedative to calm him (Doc. 15).

TDG reported the assault to his mother, Gaines, who tried to remove him from Longleaf (Doc. 15). When Gaines took pictures of her son's injuries, she was expelled from the hospital (Doc. 15). Gaines then reported the assault and battery to local law enforcement, but the Hospital personnel obstructed the officers from entering the facility to investigate the complaint (Doc. 15). TDG was discharged from Longleaf Hospital when a detective threatened to shut it down (Doc. 15). Shortly thereafter, TDG was sent to the Mississippi State Hospital.

## C. Plaintiffs' claims do not meet the $75,000 jurisdictional threshold.

Defendants argue that Plaintiffs' medical records do not indicate their claim meets the $75,000 jurisdictional threshold for federal diversity jurisdiction.

### 1. Proving the jurisdictional amount.

The general-diversity statute permits federal district court jurisdiction over suits for more than $75,000 between citizens of different States. See 28 U.S.C. § 1332(a); Caterpillar Inc. v. Lewis, 519 U.S. 61, 68 (1996); Stangel v. A-1 Freeman N. Am. Inc., 64 Fed. Appx. 416, *1 (5th Cir. 2003). The burden of establishing subject matter jurisdiction in federal court rests on the party seeking to invoke it. See St. Paul Reinsurance Co. Ltd. v. Greenberg, 134 F.3d 1250, 1253 (5th Cir. 1998).

In a typical diversity situation, the plaintiff files a suit in federal court alleging damages in a determinate amount in excess of the jurisdictional amount. See DeAguilar v. Boeing Co., 47 F.3d 1404, 1409 (5th Cir. 1995), cert. den., 516 U.S. 865 (1995). Unless the law gives a different rule, the sum claimed by the plaintiff controls if the claim is apparently made in good faith. St. Paul Reinsurance Co., Ltd., 134 F.3d at 1253. To justify dismissal, it must appear to a legal certainty that the claim is really for less than the jurisdictional amount.[2] See St. Paul Reinsurance Co., Ltd., 134 F.3d at 1250.

---

[2] The proper inquiry is whether it is facially apparent from the complaint that the amount in controversy likely exceeds $75,000. See Celestine, 2011 WL 4565756, *1 (citing Allen v. R & H Oil & Gas Co., 63 F.3d 1326, 1336 (5th. Cir. 1999)); see also Hartford Ins. Group v. Lou-Con Inc., 293 F.3d 908, 910 (5th Cir. 2002); St. Paul Reinsurance Co. Ltd., 134 F.3d at 1253. For purposes of the "facially apparent" test, bare allegations of jurisdictional fact are insufficient to vest a federal court with jurisdiction. Celestine, 2011 WL 4565756, *1 (citing St. Paul Reinsurance Co., Ltd., 134 F.3d at 1253).

However, the "legal certainty" test has limited utility and is inapplicable in cases where a plaintiff alleges damages of an indeterminate amount. See Celestine v. Transwood, Inc., 2011 WL 4565756, *1 (M.D. La. 2011), aff'd, 467 Fed. Appx. 317 (5th Cir. 2012) (citing St. Paul Reinsurance Co., Ltd., 134 F.3d at 1234). Where a plaintiff alleges damages of an indeterminate amount, so the amount at issue is not facially apparent in the complaint, the court may rely on "summary judgment-type" evidence to ascertain the amount in controversy. See Hartford Ins. Group, 293 F.3d at 910; St. Paul Reinsurance Co. Ltd., 134 F.3d at 1253; see also Allen v. R & H Oil & Gas Co., 63 F.3d 1326, 1336 (5th Cir. 1995). In addition to the complaint itself, the Court must also look at other evidence relevant at the time the complaint was filed.[3] See St. Paul Reinsurance Co. Ltd., 134 F.3d at 1253. When a complaint does not allege a specific amount of damages, the party invoking federal jurisdiction must prove by a preponderance of the evidence that the amount in controversy exceeds the jurisdictional amount.[4] See St. Paul Reinsurance Co., Ltd., 134 F.3d at 1253; see also Allen, 63 F.3d at 1336 (citing De Aguilar v. Boeing Co., 11 F.3d 55, 58 (5th Cir. 1993) ("De Aguilar I").

---

[3] The jurisdictional facts must be judged as of the time the complaint is filed; subsequent events cannot serve to deprive the court of jurisdiction once it has attached. See Hartford Ins. Group, 293 F.3d at 910; St. Paul Reinsurance Co., Ltd., 134 F.3d at 1253.

[4] Although most cases regarding the amount in controversy requirement for diversity jurisdiction have arisen in the context of removal from state to federal court, the procedures developed in those cases are instructive in the converse context of actions initially filed in federal court. See St. Paul Reinsurance Co., Ltd., 134 F.3d at 1253.

## 2.  The evidence as to the jurisdictional amount.

Defendants submitted an uncertified transcript[5] of an interview of TDG conducted by Bethany Branim ("Branim"), an employee of the Rapides Children's Advocacy Center.  TDG stated that, before the incident, he got into a fight with another boy at the Hospital, they were separated, but they started fighting again and had to be separated again (Doc. 25-3, pp. 8-9/18).  TDG stated that Ms. Karis, "Mr. Keith," and "Mr. Jacob" told them to "chill out," but TDG continued to try to fight and was being disrespectful, so Mr. Keith held him down on his bed by his biceps (Doc. 25-3, p. 9/18).  At some point during the struggle, TDG managed to land on the floor and Mr. Keith "hit" TDG in the nose, cutting it and making it bleed (Doc. 25-3, pp. 11-12/18).  TDG said he knows it was Mr. Keith who hit him because he apologized to TDG, saying "I'm sorry" and "my bad, I didn't mean to do that" (Doc. 25-3, pp. 11-12/18).  TDG said he responded "it's cool" (Doc. 25-3, p. 12/18).

TDG said he did not have any marks, bruises, or cuts from fighting with the other patient (Doc. 25-3, p. 14/18).  Ms. Karis gave TDG a bandage for his nose.  TDG said he has never seen Mr. Keith hit anyone else and that he had never hit TDG before (Doc. 25-3, p. 16/18).

Defendants also submitted an excerpt from TDG's deposition (Doc. 32-1).  TDG testified he thinks he has been involved in about 15 to 20 fights, of which about eight were serious (Doc. 32-1, pp. 3-4/24).  TDG also testified that, when he got into the

---

[5] Defendants attached uncertified evidence to their motion (the transcript of TDG's interview and three depositions).  See Fed. R. Civ. P. Rule 30(f).  However, since Plaintiffs did not object, the evidence will be considered for purposes of this motion only.

fight with the other patient at Longleaf, he was placed in restraints because he would not calm down (Doc. 32-1, p. 19/24). TDG fought against the restraints, so the technicians (including "Josh," "Keith," and "D") took him to his room, and "Josh" "slammed" him on his bed (Doc. 32-1, p. 19/24). Keith then "struck" TDG and Josh "hit" him in his stomach (Doc. 32-1, p. 19/24). TDG said he was on his back, "fidgeting" to get away, and ended up falling off the bed onto the floor (Doc. 32-1, p. 22/24). The cut on TDG's nose bled, but did not hurt until the next day (Doc. 32-1, p. 23/24). TDG testified his nose was completely healed in about a month and his black eyes went away in about a week and a half (Doc. 32-1, p. 24/24).

Defendants also submitted an excerpt from Gaines's deposition (Doc. 32-2). Gaines testified that TDG curses and raises his voice, but would never hit her (Doc. 32-2, p. 2/13). Gaines called the police two or three times prior to the Longleaf incident because she could not control TDG, and has called the police three or four times since then (Doc. 32-2, pp. 2-4/13).

Gaines testified that TDG currently sees a psychiatrist, Dr. Omolara, once a month, and is taking four medications (Doc. 32-2, pp. 7-9/13). TDG was taking medications (such as an anti-depressant) before the incident at Longleaf (Doc. 32-2, pp. 7-9/13). Plaintiffs admit they are not seeking reimbursement for medical expenses and are not claiming lost wages in this lawsuit (Doc. 32-2, pp. 5, 12/13).

Gaines testified that, other than the laceration on his nose and black eyes, TDG's injuries from the incident are all mental (Doc. 32-2, p. 9/13). Since the incident at Longleaf, Gaines has observed that TDG does not trust her judgment as much as

he used to, so he constantly second-guesses her (Doc. 32-2, p. 10, 13/13). Gaines admitted that TDG's diagnoses before the incident–oppositional defiant disorder, intermittent explosive disorder, and attention deficit disorder–have not changed (Doc. 32-2, pp. 11-12/13). TDG is still able to do his chores, play basketball, and skateboard (Doc. 32-2, p. 12/13). The Longleaf incident has not affected TDG's hobbies (Doc. 32-2, p. 12/13). Before the incident, TDG had a defiant personality, but since then he has become older and more mature, and has mellowed (Doc. 32-2, p. 13/13).

Plaintiffs submitted an affidavit from Demarques Montrell Mitchell ("Mitchell"), who states he was a patient in the juvenile male ward at Longleaf in August 2015, and was involved in a physical altercation with TDG that included some shoving but no hitting (Doc. 36-1). Mitchell states he saw two or three mental health technicians "slam" TDG to the ground and "drag" him into his room (Doc. 36-1). When TDG emerged from his room, his nose was bleeding and, the next morning, he had two black eyes (Doc. 36-1). Mitchell further states he lied to the Longleaf Patient Advocate and told her he caused TDG's injuries, because he was afraid the mental health technicians would retaliate against him if he said they had injured TDG (Doc. 36-1).

Plaintiffs submitted a deposition of Dr. Rosalie Casano (Doc. 31-1, p. 3/27). Dr. Casano testified she is a psychiatrist with board certifications in psychosomatic medicine, general psychiatry, behavioral neurology, and neuropsychiatry (Doc. 32-2, p. 5/27). Dr. Casano treated TDG when he was at the Oak Circle Center (child and

adolescent psychiatry) of the Mississippi State Hospital in November 2015, after he left Longleaf (Doc. 31-1, p. 7/27). TDG was sent there by the court (Doc. 31-1, p. 7/27). TDG told Dr. Casano that he had been disrespectful to his mother (Doc. 31-1, p. 7/27). Gaines told Dr. Casano that TDG had anger issues, was not respectful to older people, and had to have the last word (Doc. 31-1, p. 7/27). On admission, TDG's symptoms included lying to get his way, arguing to get his way, cursing, noncompliance with outpatient treatment, fighting with his peers, and bullying (Doc. 31-1, p. 8/27).

Dr. Casano testified that TDG's history includes hitting a school security guard, delayed milestones at age two, hyperactivity at age two, and food hoarding (Doc. 31-1, p. p. 9/27). TDG had reports of behavioral or emotional problems around age 8 or 9 (Doc. 31-1 p. 9/27). TDG's history also included having been "hit at Longleaf with facial laceration" (Doc. 31-1, p. 9/27).

Dr. Casano testified that her preliminary diagnosis of TDG was ADHD, intermittent explosive disorder, psychotic disorder not otherwise specified, speech-language disorder, and victim of neglect (Doc. 31-1, p. 10/27). Dr. Casano thought TDG probably suffered from those disorders for many years prior to his admission to Mississippi States Hospital (Doc. 31-1, p 10/27). TDG reported hearing voices as a child (Doc. 31-1, p. 10/27). Dr. Casano's admission note for TDG included notes that TDG would try to get his way at all costs; did not care about others' feelings; had no problems with anxiety; would lie to get his way although he knew right from wrong; repeatedly stole and hoarded food; repeatedly violated probation; could not accept criticism; had destroyed others' property (tore up others' cell phones); cried easily; hit

sheetrock; "remote controlled" by meddling/picking at others; smashed his pencils and games when angry; had carved in furniture; would not shower; and would sleep in school clothes and attempt to wear dirty clothes to school again (Doc. 31-1, p. 10/27).

On admission, TDG did not have any observable injuries to his face (Doc. 31-1, p. 11/27). In his initial nursing assessment, TDG reported to the nurse that he had not had any psychological trauma, accidents, or injuries in the last six months (Doc. 31-1, p. 10/27). When asked about information for his Crisis Prevention Plan, TDG said he did not have anything to tell them about his trauma history that could help them assist in his recovery (Doc. 31-1, p. 11/27). TDG complained that he did not like the side effects of his ADHD medication (dry mouth, decreased appetite, and not feeling like himself) (Doc. 31-1, p. 12/27). TDG also claimed he was only there because his mother "wanted a break" from him (Doc. 31-1, p. 12/27).

Dr. Casano's final diagnosis of TDG at discharge was intermittent explosive disorder, speech-language disorder, and victim of neglect (from birth to two years old) (Doc. 31-1, pp. 12, 15/27). Dr. Casano testified that TDG does not suffer from depression or a psychotic disorder (Doc. 31-1, p. 12/27). Dr. Casano further testified that violent acts by mental health technicians would be adverse to the psychiatric progress of someone with an intermittent explosive disorder (Doc. 31-1, p. 12/27).

Dr. Casano agreed that, if TDG told a juvenile advocacy investigator during a recorded interview, before going to the Mississippi State Hospital, that he did not want to get the mental health technician who struck him in trouble, then it would not

surprise her that TDG did not report the incident at the Hospital when he was interviewed (Doc. 31-1, pp. 15-16/27).

### 3. The evidence does not support the requisite jurisdictional amount.

Since Plaintiffs are invoking federal jurisdiction in this case, they have the burden of proving their claims meet the jurisdictional threshold of more than $75,000 by a preponderance of the evidence. Defendants have offered evidence as to what occurred during the incident in order to defeat and deny Plaintiffs' claims.

Plaintiffs claim medical malpractice, negligence, and failure to train. However, Plaintiffs have not shown they exhausted their administrative remedies for their medical malpractice claim by presenting it to a medical review panel. Plaintiffs' claims of negligence and failure to train pertain to his claimed injuries.

Defendants neglected to discuss Plaintiffs' claim for emotional trauma caused by an assault by a mental health care provider. Plaintiffs claim TDG required mental health treatment before the incident, and have offered some evidence that the incident necessitated additional treatment.

Plaintiffs offer more than bare allegations of jurisdictional facts. See Celestine v. Transwood, Inc., 2011 WL 4565756, *1 (M.D. La. 2011) (plaintiff's bare allegation that the amount in controversy exceeds $75,000 is insufficient to show the amount in controversy likely exceeds $75,000). Plaintiffs have shown that, at the time of the incident, TDG had mental health problems for which he was undergoing treatment. Plaintiffs allege one of the mental health technicians struck and injured TDG,

causing him both physical injury (one laceration and two black eyes) and emotional distress, and necessitating additional mental health treatment.

Plaintiffs admit they are not seeking medical expenses and that TDG's mental health problems were pre-existing. For purposes of recovery, Plaintiffs allege only that the incident at Longleaf Hospital traumatized TDG and lengthened his treatment for his pre-existing problems. Plaintiffs have not shown by a preponderance of the evidence that their claims are worth in excess of $75,000. As Defendants contend, Plaintiffs' claims of personal injury and emotional distress, by themselves, are not worth in excess of $75,000.[6]

Since Plaintiffs have not shown by a preponderance of the evidence that their claims are worth in excess of $75,000, they have not met the federal jurisdictional threshold for diversity jurisdiction. Accordingly, Defendants' motion to dismiss for lack of subject matter jurisdiction (Doc. 25) should be granted.

---

[6] See Childs v. Berry, 268 Ark 970, 974, 597 S.W.2d 134, 135 (1980) ($3,000 compensatory damages for false imprisonment, assault, battery, swollen nose, black eyes, cuts, bruises, and mental anguish); Allen v. Pinewood Country Club, Inc., 292 So.2d 786, 790 (La. App. 1st Cir. 1974) ($3,500 for pain and suffering for black eyes, swollen nose, fracture of nasal pyramid, deviation of nasal septum, laceration of dorsum, and submucous resection of nasal septum and open reduction of nasal fracture); Silveira v. Murray, 96 R.I. 384, 389, 192 A.2d 18, 21 (1963) ($1,550 damages for two black eyes, laceration of nose, and brain concussion).

Although these cases are old, factoring an inflation rate of 500% (from 1975 to 2017), or even 1000%, still does not indicate that Plaintiffs meet the jurisdictional threshold in this case. See Bureau of Labor Statistics, United States Department of Labor: CPI Inflation Calculator *at* https://www.bls.gov/data/inflation_calculator.htm.

## III. Conclusion

Based on the foregoing, IT IS RECOMMENDED that Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction (Doc. 25) be GRANTED and that Plaintiffs' claims be DISMISSED WITHOUT PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b), parties aggrieved by this Report and Recommendation have fourteen (14) calendar days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. No other briefs (such as supplemental objections, reply briefs, etc.) may be filed. Providing a courtesy copy of the objection to the undersigned is neither required nor encouraged. Timely objections will be considered by the District Judge before a final ruling.

Failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation within fourteen (14) days from the date of its service, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Judge, except upon grounds of plain error.

THUS DONE AND SIGNED in chambers in Alexandria, Louisiana, this ___7th___ day of December, 2017.

Joseph H.L. Perez-Montes
United States Magistrate Judge